

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

DMP/CRH/SKK:ADR/AS  
F.#2024R00396

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

May 10, 2024

By ECF and Email

The Honorable Natasha C. Merle  
United States District Judge  
Eastern District of New York  
225 Cadman Plaza East  
Brooklyn, New York 11201

        Re:    United States v. Halima Salman  
                  Criminal Docket No. 24-189 & Magistrate Docket No. 24-MJ-350

Dear Judge Merle:

        The government respectfully writes in opposition to the defendant Halima Salman's appeal of the decision by the Honorable Robert M. Levy, U.S. Magistrate Judge, to deny the defendant's application for release pending trial in this matter. The defendant is charged with receiving military-type training from the Islamic State of Iraq and al-Sham ("ISIS"), a foreign terrorist organization, in violation of 18 U.S.C. § 2339D. See Compl. (ECF No. 1).[1] She is charged with this conduct because, as an adult, the defendant made the decision to train with ISIS in the use of an assault rifle, and to receive ammunition for the future use of that weapon. See Gov't Det. Memo. (ECF No. 4). After a lengthy detention hearing, Judge Levy made a well-reasoned decision denying bail, based on the presumption of detention in this case, consideration of all the Bail Reform Act factors, Pretrial Services' recommendation of detention, and a finding that the evidence established the defendant is both a danger to the community and a risk of flight. See Det. Hr'g Tr. (ECF No. 8). The defendant's appeal offers no new facts or argument, nor a materially different bail proposal, that would support the conclusion that Judge Levy should be reversed on both of these determinations. Accordingly, the government respectfully requests that the Court deny the defendant's appeal and affirm Judge Levy's order of detention.

---

      [1]    Unless otherwise indicated, all docket references are to criminal docket 24-CR-189.

I. <u>Relevant Facts</u>

    A.    <u>Halima Salman's Receipt of Military-Type Training from ISIS as an Adult</u>

On this appeal, the defendant tells this Court the same alternative narrative of her conduct that she presented before Judge Levy, but again offers no evidentiary support for her claims. Contrary to her assertions, the evidence does not support the defendant's arguments that her conduct in Syria was beholden to the whims of her father or husband, that she sought to flee from ISIS as soon as she could, that she was smuggled away from her husband, and that she pursued repatriation any way she could. In fact, the government's evidence refutes all of these claims.

Halima Salman has been charged for conduct she undertook of her own volition, after she turned 18 years old and while she was in ISIS-controlled areas of Syria. Although she was 17 years old when she and her family traveled into an ISIS-controlled area of Syria in late 2016 or early 2017, the defendant soon after turned 18 years old in May 2017.

After turning 18, the defendant married a military-age member of ISIS whose kunya, or nom de guerre, is Abu Ali al-Almani al-Khorasani. Photos from the defendant's wedding day, retrieved from a phone that belonged to her husband, not only depict her wearing a wedding dress with the ISIS flag behind her, but also includes metadata that the picture was taken in July 2017, <u>after</u> she was 18 years old. After marrying her husband, the defendant moved away from her family to live with her husband in a different city in ISIS-controlled Syria. She told law enforcement in a November 2023 <u>Mirandized</u> interview that the separation from her family was difficult, but during no part of that interview did the defendant indicate she did not want to live with her husband. Just the opposite, she told law enforcement in November 2023 and May 2024 that she and her husband had a loving relationship. Indeed, intimate photographs from her husband's phone and an intimate note from her husband confirm that the defendant and her husband expressed love for each other and is broadly consistent with a consensual relationship.

Having moved away from her father and now a married woman, the defendant was not directly subject to her father's will, who in any event was killed in 2018. After her father was killed, the defendant did not leave her husband or pay a smuggler to take her to Baghouz. Apart from the fact that Baghouz was an ISIS stronghold in 2018 fully under ISIS control—making it an unlikely destination to be smuggled to if one were seeking to leave ISIS— the regions of Iraq close to Baghouz were also controlled by ISIS in 2018. More problematic for the defendant's narrative of events is the fact of her capture (or surrender): the defendant was with her husband in Baghouz in early 2019 at the last battle of Baghouz where ISIS fell to opposing forces. Put differently, the defendant was with her husband in early 2019, well after her father died, in Baghouz, the last ISIS stronghold in Syria where ISIS was making its last stand against opposing forces. There is no evidence at all to support the defendant's statements now that she sought to be smuggled out of ISIS territory. Indeed, when questioned by law enforcement in November 2023, the defendant never mentioned that she sought to be smuggled out of ISIS territory.

2

Far from being smuggled out of ISIS territory in 2018, the evidence shows that the defendant was receiving military-type training from ISIS at that time. As detailed in the complaint, a document issued by the ISIS "Diwan al-Jund," ("Department of Soldiers") states, in sum and substance, "Umm Khattab al-Muhajir" completed her military training successfully and was qualified to receive ammunition for an "AK47" that was already in her possession, and that "Umm Khattab al-Muhajir" is the spouse of "Abu Ali al-Almani al-Khorasani" (i.e., the defendant's husband). The letter indicates that it was signed by an ISIS unit called the "Nusaybah bint-Ka'ab," also referred to as the "Nusaybah Katiba" or the "Katiba Nusaybah," which was the ISIS military battalion or unit composed solely of female members of ISIS, principally those who were or had been married to male ISIS fighters. The metadata of the photo of this military document shows that it was created in March 2018, after she turned 18 in 2017. The fact that the letter refers to her as the spouse of her husband, whom she married after she turned 18 years old, confirms that she received this training as an adult.

The defendant confirmed to law enforcement on May 6, 2024, after waiving her Miranda rights, that the military document referred to her by her kunya, Umm Khattab al-Muhajir. Of particular note is that "al-Muhajir" translates to "foreign fighter," and "al-Muhajir," along with "muhajireen," is a common term used by ISIS to refer to individuals who traveled from outside ISIS territory to ISIS territory to join ISIS as fighters. Defendant argued before Judge Levy that she did not select her kunya, see ECF No. 8 at 16 ("By the way, Halima didn't choose her kunya. It was given to her. She was married to this man. He had a kunya. He was a member of ISIS. She was given a kunya."); however, during her November 2023 interview with law enforcement, the defendant stated that she selected her kunya, specifying to law enforcement only "Umm Khattab." That the defendant chose her own kunya is also confirmed by the fact that the defendant's email address, which was created in August 2016, begins with "umkhatab."

In addition to this document, as well as the defendant's own statements, other evidence establishes that the defendant committed the charged offense. Photographs of the defendant—which appear to be self-taken—depict her in front of an ISIS flag and also with an AK-47 in the background. These similarly have metadata which reflect that they were taken when the defendant was an adult. Similarly, a video, also with metadata reflecting that it was created after she was an adult, depicts the defendant brandishing an AK-47. That these pictures and video were taken in 2018, the year in which her father was killed and she allegedly fled her husband, contradict her narrative that she attempted to leave ISIS territory.

The defendant's actions when she was captured by or surrendered to forces opposed to ISIS also contradict her current statements that she continually sought her repatriation and that she had left her husband. Indeed, after her capture or surrender, the defendant identified herself as Halima Nurzad—using her husband's real last name. Notably, the defendant's husband is not a U.S. citizen and has never lived in the United States. The defendant's decision to use her married name appears to reflect her own belief in the continuing significance of her marriage. And her decision not to use her original name that would connect her to the United States is contrary to the claim that she immediately sought recognition as an American and repatriation back to the United States, because there would have been no record of a U.S. citizen by the name of Halima Nurzad. That was not the only false statement she provided that would

have obscured her U.S. citizenship; during that same encounter, the defendant provided a different birthdate and a birthplace in the country of Georgia.

The defendant made decision after decision as an adult, of her own free will, exercising her own agency. And important here is she exercised her own agency, as an adult, to receive military-type training from ISIS.

B.  The Detention Determination

Shortly after the defendant's arrest on May 7, 2024, the defendant appeared for her arraignment and detention hearing before Magistrate Judge Levy, during which she sought bail. The government opposed bail both in a filed detention letter and during the hearing, arguing, among other things, that (i) the defendant was charged with a crime that triggered a presumption of detention; (ii) the defendant's charged offense was a federal crime of terrorism, which is a category of crimes that Congress has specifically enumerated as one that carries a presumption that no condition or combination of conditions will be sufficient to permit a defendant to be released on bond; (iii) the defendant presented a risk of flight and a danger to the community; and (iv) the four factors in the Bail Reform Act all weighed in favor of detention. See generally ECF Nos. 4, 8. Pretrial Services similarly determined that no condition or combination of conditions would permit the defendant's release, and that the defendant was both a flight risk and danger to the community based on, among other things, her use of an alias, substantial ties to foreign countries, ties to ISIS, and past possession of firearms.

The defendant's proposed release package at the detention hearing is materially similar to what she presents now on appeal. Without proposing a particular bond amount, at the detention hearing, the defendant offered eight suretors—five of whom were recently repatriated to the United States from Syria following years living first in ISIS territory and then at Syrian Democratic Forces ("SDF") camps, have the same currently limited contacts with the United States that she does, and no current means of income. The defendant offered a single property as secured collateral, which the defense asserts to be worth $151,000, from the defendant's grandmother, whom she has not seen in years and with whom she has had only intermittent contact. The defendant also indicated that the defendant's uncle might be able to sign as a suretor (although listing him as one of the eight suretors).

After over an hour of arguments, punctuated by a number of thoughtful questions from the Court to both parties, Judge Levy determined that "the government has the better of the argument at this point" and that "what's before me at this time is sufficient to indicate to me that the government has met its burden under the four factors in the Bail Reform Act." ECF No. 8 at 40. While Judge Levy recognized that there were "contradictions in the perspective[s]" between the parties, he concluded that "the government has more evidence behind it than the defense does at this point." Id. Judge Levy correctly concluded that a detention hearing "is not a trial," so the government's burden is not "beyond a reasonable doubt"; rather, the government's burden on risk of flight is "only a preponderance of the evidence" and clear and convincing evidence for danger to the community, and as to both, the government had met its burden. Id. at 39, 40 (emphasis added). As to the defendant's bail package, Judge Levy concluded that it was "not strong enough for a release at this time." Id. at 40.

4

C.      The Instant Appeal and Revised Bail Application

The defendant's bail application remains insufficient, as Judge Levy previously concluded when presented with a materially similar package. The defendant once again failed to propose a specific bond amount, only later advising the government by email that the proposed amount would be $200,000, secured by the same home previously offered at the detention hearing. This is not an amount that is commensurate with the facts of this case, including the defendant being charged with a federal crime of terrorism, the presumption of detention, the defendant's risk of flight and dangerousness, and the factors under the Bail Reform Act.

The defendant also increased the number of suretors from eight to ten. The two new suretors that the defendant proffers have not provided any indication that they have been in contact with the defendant and her family over the last eight years such that they can exert any moral suasion. One of the new suretors was a neighbor that the defendant had when she lived in Egypt for three years while the defendant was between 9 and 12 years old. The second new suretor is that same neighbor's daughter, who was herself only 12 to 15 years old at the time she knew the defendant. Nothing in the submission mentions whether either suretor had been in communication with the defendant or her family while they were in ISIS territory or at SDF camps. Simply put, adding two more suretors who have not seen the defendant since 2011, who knew the defendant only when she was around 9 to 12 years old, and who appear to lack any moral suasion over her, does not materially change the defendant's bail package, which Judge Levy found to be insufficient.

II.    Legal Standard

If a defendant is ordered detained by a magistrate judge, that person may file "a motion for revocation or amendment of the order." 18 U.S.C. § 3145(b). This Court reviews the order de novo, see, e.g., United States v. Leon, 766 F.2d 77, 80 (2d Cir. 1985), but "[w]hile a District Court should reach its own independent conclusion, 'a district judge is entitled to give a magistrate judge's findings of fact such weight as their merit commands and the sound discretion of the judge warrants.'" United States v. Fishenko, No. 12 CR 626 SJ, 2013 WL 3934174, at *2 (E.D.N.Y. July 30, 2013), aff'd, Docket No. 13-3020 (Sept. 23, 2013) (quoting United States v. Zahrey, No. 96 CR 910, 1996 WL 650980, at *1 (E.D.N.Y. Nov. 7, 1996)).

For certain offenses, including the military training charge contained in the complaint, the law presumes that there is no set of conditions that will reasonably assure the defendant's appearance or the safety of the community. See 18 U.S.C. § 3142(e)(3)(C) (applying a rebuttable presumption of detention for "an offense listed in section 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed."). The offense with which the defendant is charged is listed in Section 2332b(g)(5)(B) and carries a maximum term of 10 years, thus triggering the presumption of detention.[2]

---

[2]    The defendant states in her bail appeal that "liberty is the norm, and detention prior to trial . . . is the carefully limited exception," ECF No. 9 at 4; however, that is not the case when a defendant is charged with a class of crimes that creates a presumption of detention. In

5

Where there is a rebuttable presumption of detention, as there is here, "the defendant bears a limited burden of production—not a burden of persuasion—to rebut that presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight." United States v. English, 629 F.3d 311, 319 (2d Cir. 2011) (quotation marks omitted). But "[s]atisfying the burden of production does not eliminate the presumption favoring detention." Id. Rather, the presumption "remains a factor to be considered among those weighed by the district court." Id. This is so because the presumption "reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial" and "represents Congressional findings that certain offenders . . . are likely to continue to engage in criminal conduct undeterred either by the pendency of charges against them or by the imposition of monetary bond or other release conditions." United States v. Stone, 608 F3d 939, 945-946 (6th Cir. 2010) (internal quotation marks and citation omitted) (ellipsis in original).

"At all times the government retains the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community, and by the lesser standard of a preponderance of the evidence that the defendant presents a risk of flight." English, 629 F.3d at 319 (quotation marks omitted).

### III.   The Court Should Affirm the Order of Detention for the Defendant

As set forth above, in the government's detention letter, and at the detention hearing, there is a presumption that no condition or combination of conditions will permit the defendant to be released on bond, and the defendant has failed to carry her burden of production to rebut that presumption. The defendant instead has presented a narrative that is contradicted by multiple facts that the government has proffered[3] and which are supported by specific evidence the government's investigation has gathered. At most, the defendant's application is a revisionist storytelling, replete with demonstrably false statements, evidencing a lack of candor with the Court that, by extension, indicates that the defendant cannot be trusted to abide by any condition of release imposed by the Court and Pretrial Services.

As Judge Levy found, the government's proffer demonstrates that the defendant is a risk of flight by a preponderance of the evidence and a danger to the community by clear and convincing evidence. Judge Levy's analysis of the Bail Reform Act factors confirms that his conclusion was sound, and nothing about the defendant's tendered arguments on appeal undermine Judge Levy's analysis and determination that the defendant should be detained based on these two independent concerns. Accordingly, the Court should affirm the order of detention entered by Judge Levy based on both the defendant's risk of flight and danger to the community.

---

this situation, Congress has expressly determined that detention is the norm, and release is the exception.

[3]   Detailed herein is a proffer of the relevant facts and a discussion of the applicable law pertaining to the pretrial detention of the defendant. See United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (holding that the government is entitled to proceed by proffer in detention hearings).

6

A. <u>The Defendant Has Not Rebutted the Presumption of Detention</u>

The defendant argues that she has "submitted sufficient evidence to rebut the presumption" of detention, ECF No. 9 at 4, but she has done no such thing. Indeed, she has offered no evidence, but has merely put forth a story that materially differs from her prior statements to law enforcement. The defendant largely attempts to deflect blame and claims a lack of agency when, as the government's proffered evidence shows, the defendant repeatedly exercised her free will as an adult, including when she sought out and received military-type training from a ruthless, violent terrorist organization. Accordingly, the presumption of detention remains in this matter.

The government's basis for seeking detention was not and is not limited to the fact of the presumption of detention. Rather, detention here is supported by each of the Bail Reform Act factors, which demonstrate that the defendant is a risk of flight and a danger to the community, and no condition or combination of conditions can assure the safety of the community or her return to Court.

Despite all Bail Reform Act factors supporting detention, the defendant seems to suggest that Judge Levy impermissibly relied on certain factors. Specifically, under the heading "forbidden considerations in the presumption case," the defendant asserts that "it is impermissible to detain a defendant in a presumption case based solely on the nature of the crime charged or the weight of the evidence." ECF No. 9 at 6. The defendant provides no citation or any legal support for this claim. Notwithstanding the fact that the record reflects that Judge Levy considered and balanced all of the factors, even if the Court had relied on certain factors more than the others, the law is clear that such weighing is appropriate: a court "has broad discretion to determine how much weight to assign the factors listed in § 3142(g) based on the circumstances of a particular case." <u>United States v. Zhang</u>, 55 F.4th 141, 144 (2d Cir. 2022). As explained by the Second Circuit in <u>Zhang</u>:

> Although § 3142(g) of the Bail Reform Act lists various factors to consider, it says nothing about the relative weight a court should give them when deciding whether to release or detain a defendant. That silence is unsurprising, because the weight given to each factor will inevitably vary from case to case, and might even vary depending on whether the inquiry relates to a defendant's danger or to his risk of flight. What is more, certain factors might interact with one another in a particular case in a way that alters a court's analysis of a defendant's danger to the community or flight risk.

<u>Id.</u> at 149-50 (citation omitted). As a result, Judge Levy's conclusion that the government's proffer of evidence was more persuasive and supported than the defendant's narrative and that the nature of the crime charged is a serious federal terrorism crime, if those were the only factors he relied on—which they are not—is entirely supported by Second Circuit precedent.

In any event, Judge Levy's decision was not cabined to only the weight of the evidence and the crime charged, and the defendant's incorrect statement of law ignores that

7

Judge Levy considered each of the four Bail Reform Act factors, as well as the interrelationship of those factors. The nature of the crime charged affects how a court considers the defendant's dangerousness, another specified factor under the Bail Reform Act, and here, the crime charged is receiving training on an assault rifle. Plainly, an individual who received training on an assault rifle by a terrorist organization is more dangerous than an individual who has not. Similarly, the nature of the crime charged, including the potential term of incarceration a defendant might face upon conviction, and the weight of the evidence directly impact the analysis of the defendant's incentive to flee, which is a consideration when assessing the defendant's characteristics—the remaining factor under the Bail Reform Act. Here, the defendant is facing a significant statutory sentence of ten years' imprisonment because of the crime charged, heightening her incentive to flee from justice and thus impacting how the Court views her characteristics under the Bail Reform Act.

The government does not herein repeat its analysis of each of the four Bail Reform Act factors set forth in its original detention letter, see ECF No. 4, but incorporates those arguments by reference here.

B.  The Defendant's Proposed Conditions for Release Are Insufficient

In addition to the amount of the bond package and the security for that package being inadequate and the proposed suretors being insufficient to exert appropriate moral suasion over the defendant, the defendant's proposed conditions of release are also insufficient. The defendant proposes nine conditions of release, but they are collectively insufficient to assure the safety of the community and the defendant's appearance at court proceedings. In the first instance, the defendant in large part proposes a standard set of conditions for what is a non-standard charged crime. Given the seriousness of the crime, it is surprising that the defendant does not propose home incarceration or home confinement, but even such conditions would not be sufficient here. Even release to home incarceration would mean that the defendant would go back to live in a home with nine other members of her family who were also repatriated from Syria and who might now be collectively incentivized to flee together to prevent their daughter and sister from facing a significant sentence of ten years' imprisonment.

The defendant also suggests a non-standard condition, which is that "[t]he defendant must participate in a program administered by Parents for Peace, or another suitable program as directed by Pretrial Services." ECF No. 9 at 3. The defendant describes the organization as "a highly-regarded not-for-profit organization that has been providing services to meet this need for alternative and diversion strategies in cases involving extremism," and that it consists of an "alliance of parents of extremists, former extremists, survivors of extremism, researchers, and clinicians with significant experience with and dedication to compassionate de-recidivism work in terrorism cases." Id. However, the defendant's suggestion puts the cart before the horse. The defendant cannot argue she has no extremist beliefs, see id. at 8 (the defendant "has never expressed any violent or extremist sentiments"), but then suggest that it would ensure the safety of the community were she to receive rehabilitation for her extremism. More fundamentally, deradicalization and rehabilitation programs presume acceptance of responsibility, which has not occurred here; thus, there would be no reason why enrollment in such a program would minimize the defendant's danger to the community or risk of flight.

8

IV.      <u>Conclusion</u>

        For the foregoing reasons, the Court should affirm Judge Levy's order of detention pending trial based on both risk of flight and danger to the community. The defendant is charged with an extremely serious offense, which carries a presumption of detention, and she faces a potential sentence of 10 years' imprisonment. The government respectfully submits that no condition or combination of conditions will assure the safety of the community, the defendant's return to Court, or her compliance with the Court's directives.

        Respectfully submitted,

BREON PEACE
United States Attorney

By:   /s/ Amanda Shami
      Andrew D. Reich
      Amanda Shami
      Assistant U.S. Attorneys
      (718) 254-7000

cc:     Clerk of Court (by ECF and Email)
        Samuel Jacobson, Esq. (by ECF and Email)